

FILED
2020 Jul-09  PM 02:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| SAMANTHA DUNCAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 7:20-cv-00298-LSC |
| | ) | |
| SHERIFF JODY WADE AND | ) | |
| JIMMY WARD, | ) | |
| | ) | |
| Defendants. | ) | |

**Memorandum of Opinion**

Plaintiff Samantha Duncan ("Plaintiff") brings this action against Defendants Sheriff Jody Wade ("Sheriff Wade") and Deputy Jimmy Ward ("Deputy Ward") (collectively, "Defendants"), alleging a Fourth Amendment excessive force claim and a failure to train claim under 42 U.S.C. § 1983, as well as a state law claim for assault and battery. Before the Court is Deputy Ward's Motion for Summary Judgment (doc. 9) and Sheriff Wade's Motion to Dismiss or In the Alternative Motion for Summary Judgment (doc. 6). The motions have been briefed and are ripe for review. For the reasons stated below, Defendants' motions are due to be granted.

## I.     Background[1]

Plaintiff was a passenger in a car driven by her cousin, Ricky Duncan ("Ricky"), when they were pulled over by Centreville Officer Jim Gray ("Officer Gray"). What started as a routine traffic stop escalated when Officer Gray asked Ricky to get out of the car because there was allegedly a warrant out for his arrest. Ricky responded that he did not want to get out of the car and asked what the warrant was for. When Officer Gray answered, "child neglect," Ricky responded "bullsh**." While those two spoke, Plaintiff chimed in saying that the child neglect warrant was "bullsh**."[2] Officer Gray then again asked for Ricky to get out of the car, and Ricky responded that he was "not going to jail for this sh** now." The interaction ended when Officer Gray said that he "didn't have the warrant, the

---

[1] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. The evidentiary record includes three body camera videos, including Deputy Ward's body cam video in which he tasered Plaintiff. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994). The Court is not required to identify unreferenced evidence supporting a party's position. As such, review is limited to exhibits and specific portions of the exhibits specifically cited by the parties. *See Chavez v. Sec'y, Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[D]istrict court judges are not required to ferret out delectable facts buried in a massive record . . . .").

[2] In her response to Deputy Ward's motion, Plaintiff neither confirms nor denies that she made this statement, but her words are clear in the video cited by Deputy Ward.

County does," and Ricky said, "well you can't serve it then," shut the door, and drove away.

Ricky drove with Plaintiff in the passenger seat and Officer Gray in pursuit. Deputy Ward and Brent Officer Shane Deason ("Officer Deason") soon joined the chase in separate police cars. Deputy Ward claims in his sworn affidavit that during the chase Ricky was travelling at 85 m.p.h. on Highway 82 and that Ricky tried to "wreck" Officer Gray.[3] Deputy Ward additionally claims that he saw Plaintiff "fidgeting and reaching as for a weapon" and that he radioed this observation to the other officers.[4]

---

[3] Plaintiff provides no objection or contradictory evidence to this point.

[4] Plaintiff provides no objection or contradictory evidence to this point. Also, Deputy Ward's sworn affidavit stating that he radioed that observation to the other officers in pursuit is corroborated by the video of the pursuit. (Exhibit B, Gray Video of pursuit; Ex. C, Ward Declaration ¶ 6). The Court notes that Defendant's Brief in Support of Motion for Summary Judgment states that "*Deputy Wade* had personally seen Plaintiff moving around in the car during the chase in such a way that he had already warned other officers that he believed she might be armed." (emphasis added). However, neither party has submitted evidence indicating that Sherriff Wade participated in the car chase and Sherriff Wade is not visible in any of the three videos submitted for evidence. Further, Defendants' factual statement in their Brief in Support of Motion for Summary Judgment does not mention Sherriff Wade participating in the car chase, let alone that Sherriff Wade "had personally seen Plaintiff moving around in the car during the chase in such a way that he had already warned other officers that he believed she might be armed." Finally, "Ward" and "Wade" are both four letter names that begin with the same two letters— "Wa." These facts together lead this Court to believe that this reference to "Deputy Wade" by the Defendants is likely a typo that refers to Deputy Ward. Under this interpretation, Deputy Ward is the only person to have allegedly seen Plaintiff "moving around in the car during the chase in such a way that he had already warned other officers that he believed she might be armed."

Ricky eventually turned onto a dirt road and stopped his car. Deputy Ward and Officers Deason and Gray also stopped and got out of their cars. Ricky then got out of his car, holding a gun in his hand.[5] Seeing the gun, Deputy Ward and Officer Deason opened fire with their service weapons, striking Ricky three times. Plaintiff was unharmed by the shooting.

Plaintiff got out of the passenger side of the car after the shooting stopped. She was wearing baggy clothing, shouting at the officers for shooting Ricky, and gesturing with her hands. Officers Deason and Gray attended to Ricky, who continued to curse at the officers. Deputy Ward stood in front of his police car approximately eight to twelve feet away from Plaintiff, with his gun pointed towards her. When Plaintiff walked to the back of the car towards him,[6] Deputy Ward lowered his gun, brought out his taser, aimed it at Plaintiff, and ordered her to "get down." Plaintiff immediately raised her hands,[7] took one step back, and stopped. Deputy Ward twice

---

[5] While not necessary to our holding in this case, Plaintiff claims that Ricky stood up with the gun in his hands to show that he was peacefully giving himself up. The video is not clear enough to confirm this assertion.

[6] Plaintiff claims that "[t]he video shows that Plaintiff never touched Deputy Ward or any other officers and never attempted to run or flee from being apprehended" and that she stepped out of the car on her own. But Deputy Ward claims that Plaintiff broke away from Officer Deason after he removed her from the car. While the video does not show Plaintiff touching any officer or attempting to flee, it also does not affirmatively show that she did not do those things.

[7] Plaintiff claims that "the video clearly shows that Plaintiff was not holding any weapons in her hands." However, the video only actually shows Plaintiff's right hand raised, while her left hand

again ordered for Plaintiff to "get down on the ground." A few seconds later, as Plaintiff remained standing with her hands in the air, Deputy Ward fired his taser, striking Plaintiff in the chest and causing her to fall to the ground. All of this happened quickly: from the shooting of Ricky to Deputy Ward firing his taser at Plaintiff, only twenty seconds passed.

Approximately three minutes after she was tased, Plaintiff was handcuffed by Deputy Ward and she walked to his police car without assistance.[8] Plaintiff is heard on the video stating that she could "walk by [her] own God [omitted] self" and subsequently asking Deputy Ward for her cigarettes. Plaintiff does not say what specific injuries she suffered from being tased, and instead generally alleges that she was "severely injured" resulting in "bruising and physical pain."

## II.    Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact[9] and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if "the record taken as a

---

is covered by her leather jacket while she raised it and was blocked by Ward's outstretched hand when it was above her head.

[8] Plaintiff cites no evidence about what occurred after she was tased. However, the video clearly shows the events as the Court has described them.

[9] A material fact is one that "might affect the outcome of the case." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1049 (11th Cir. 2015).

whole could lead a rational trier of fact to find for the nonmoving party." *Id.* A genuine dispute as to a material fact exists "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (quoting *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001)). The trial judge should not weigh the evidence, but should determine whether there are any genuine issues of fact that should be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

In considering a motion for summary judgment, trial courts must give deference to the nonmoving party by "view[ing] the materials presented and all factual inferences in the light most favorable to the nonmoving party." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1213–14 (11th Cir. 2015) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). However, "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987). Conclusory allegations and "mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Melton v. Abston*, 841 F.3d 1207, 1220 (11th Cir. 2016) (per curiam) (quoting *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004)).  In making a motion for summary judgment, "the

moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013). Although the trial courts must use caution when granting motions for summary judgment, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

### III.    Discussion

Count I of Plaintiff's Complaint alleges that Deputy Ward used excessive use of force in violation of 42 U.S.C. § 1983. Count II alleges that Sheriff Wade is liable under § 1983 for failure to train his employees on the proper use of force. Count III alleges a state law assault and battery claim against Deputy Ward. Deputy Ward argues that he is entitled to absolute immunity from the state law claim under the Alabama Constitution. Plaintiff conceded this point in her Response. Accordingly, the assault and battery claim is due to be dismissed with prejudice. The Court will address the § 1983 claims in turn.

Section 1983 provides a cause of action for plaintiffs who have suffered "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. Deputy Ward argues that qualified immunity insulates

him from this excessive force claim. Additionally, Sheriff Wade argues that because Deputy Ward did not use excessive force and therefore did not violate Plaintiff's constitutional rights, the failure to train claim against him also necessarily fails. For the reasons stated below, this Court agrees.

### A. Deciding whether Deputy Ward is entitled to qualified immunity at this stage of the litigation is proper.

Plaintiff first argues that it is premature for the Court to decide whether Deputy Ward is entitled to qualified immunity, stating that "dismissal of a plaintiff's complaint on qualified immunity grounds prior to discovery at the motion-to-dismiss stage is rarely appropriate." But this Court is not evaluating Deputy Wade's motion to dismiss—it is evaluating his motion for summary judgment. And while the motion for summary judgment was filed relatively early in this case, this case is unique. Over one year ago, Ricky Duncan brought suit against Deputy Ward, Sheriff Wade, and others who he alleges violated his constitutional rights arising out of the traffic stop and shooting. (*See Duncan v. Wade et al.*, 7:19-cv-00447-LSC.) Discovery has proceeded in Ricky Duncan's lawsuit, and the parties exchanged body camera videos of the initial traffic stop, subsequent car chase, and the ultimate shooting of Ricky and tasing of Plaintiff. Additionally, the depositions of both Ricky Duncan and Samantha Duncan have been taken. The videos and deposition transcripts were included in the summary judgment evidentiary record. Plaintiff makes no argument

that she requires more evidence or more opportunity for discovery in order to respond to the motion.

Moreover, against Plaintiff's contentions, the Court's determination of whether Deputy Ward is entitled to qualified immunity during this stage of litigation is consistent with the purpose of qualified immunity and the United States Supreme Court's directives. Qualified immunity's purpose is not only to provide protection from liability for damages but also "immunity from suit." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). In light of this purpose, courts must determine whether a defendant is entitled to qualified immunity "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam). Accordingly, the motion for summary judgement presents an opportunity to determine whether Deputy Ward is entitled to qualified immunity "at the earliest possible stage" in this litigation.

Even if this Court construed Plaintiff's argument to be a request under Rule 56(d) to "defer considering the motion or deny it" or "allow time" for her "to obtain affidavits or declarations or to take discovery," such request is due to be denied. Plaintiff did not provide an affidavit or declaration that, "for specific reasons," she "cannot present facts essential to justify [her] position." *See* Fed. R. Civ. P. 56(d). Instead, Plaintiff only generally alleged that the Court should not yet decide the

qualified immunity issue because "dismissal of a plaintiff's complaint on qualified immunity grounds prior to discovery at the motion-to-dismiss stage is rarely appropriate." This general allegation lacks the specificity necessary for this Court to delay taking action at this stage of this case. Accordingly, this Court turns to the question of whether Deputy Ward is entitled to qualified immunity.

### B. Deputy Ward is entitled to qualified immunity.

"To be entitled to qualified immunity, a government official must first prove that 'he was acting within his discretionary authority when the allegedly wrongful acts occurred.'" *Dang ex rel. Dang v. Sheriff, Seminole Cty. Fla.*, 871 F.3d 1272, 1279 (11th Cir. 2017) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)). To show that he was acting within his discretionary authority, the government official must prove that his actions "(1) were undertaken 'pursuant to the performance of his duties,' and (2) were 'within the scope of his authority.'" *Id.* (quoting *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988)).

Deputy Ward asserts in his motion for summary judgment that he was acting within his discretionary authority. Specifically, Deputy Ward argues that his use of the taser was both pursuant to the performance of his duties as a police officer and within the scope of his authority because such action was "within the line and scope of his respective duties in interacting with [Plaintiff] at all relevant times." Plaintiff

makes no argument that Deputy Ward was acting outside the scope of his discretionary authority, and any such argument would likely be unsuccessful. Accordingly, Deputy Ward has sufficiently shown that he was acting within the scope of his discretionary authority.

After the government official shows that he was acting within his discretionary authority, the burden then shifts to the plaintiff to show both that "the defendant violated a constitutional right," and that "this right was clearly established at the time of the alleged violation." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004). The plaintiff must prevail on both prongs of this test in order to defeat summary judgment on qualified immunity grounds. *Id.*

### 1. Deputy Ward's single use of the taser on Plaintiff was not excessive force.

The Fourth Amendment's prohibition against unreasonable searches and seizures includes the right to be protected from the use of excessive force. *Lee*, 284 F.3d at 1197. To determine whether a police officer's use of force was excessive, courts ask "whether a reasonable officer would believe that this level of force [was] necessary in the situation at hand." *Id.* (citation omitted). When evaluating such level of force, courts must remember that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

Moreover, the "use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* This perspective is imperative in an evaluation of a police officer's conduct, as "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

To determine the level of force a reasonable officer would believe necessary under the circumstances, the Court considers a variety of factors, including the severity of the crime at issue, the threat posed by the individual to the safety of the officer or others, and "whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. The Court may also consider "the relationship between the need and the amount of force used" and "the extent of the injury inflicted." *Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000) (quoting *Moore v. Gwinnett Cty.*, 967 F.2d 1495, 1498 (11th Cir. 1992)). Put differently, an officer's use of force is excessive when it is objectively unreasonable. *See Knox v. City of Tuscaloosa*, No. 7:16-CV-01560-LSC, 2017 WL 1833553, at *3 (N.D. Ala. May 8, 2017) (citing *Penley v. Eslinger*, 605 F.3d 843, 849–50 (11th Cir. 2010)).

Construing the facts in the light most favorable to her, Plaintiff cannot show that Deputy Ward used excessive force. Rather, the circumstances indicate that

Deputy Ward's single use of his taser on the Plaintiff was a reasonably proportional response to the dangerous, volatile situation that he was in. Two cases are especially illustrative for this conclusion: *Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004) (holding officer's single use of a taser was *not* excessive force), and *Fils v. City of Aventura*, 647 F.3d 1272, 1288 (11th Cir. 2011) (holding officer's single use of a taser *was* excessive force). Comparing the facts of those two cases to the case before the Court clearly shows that Deputy Ward's single use of his taser on Plaintiff was objectively reasonable.

On one end of the spectrum, the single use of taser in a "difficult, tense and uncertain situation" is not excessive force. *Draper*, 369 F.3d at 1278. In *Draper,* a police officer pulled over a truck driver in a routine traffic stop. The officer walked up to the truck and shined his flashlight inside at the driver. The driver rolled down the window, and twice politely asked the police officer to stop shining the light in his eyes. The officer then told the driver to meet him behind the truck. Behind the truck, the driver became "belligerent, gestured animatedly, continuously paced, appeared very excited, and spoke loudly." *Id.* at 1273. In response to the driver's behavior, the officer took out his taser. The driver ignored the officer's request for his driver's license and continued to yell complaints about the officer shining the flashlight in his eyes. The officer told the driver that he would take him to jail if he continued to yell.

A similar back and forth continued until, after the officer asked for the driver's documents for the fifth time, the police officer shot his taser at the driver's chest, dropping him to the ground.

The Eleventh Circuit held that the officer's single use of the taser was not excessive force because it was "reasonably proportionate to the difficult, tense and uncertain situation" faced by the officer. *Id.* at 1278. The court reasoned that the need for force under the circumstances, the amount of force used, and the extent of the injuries the truck driver suffered supported this conclusion. *Id.* Regarding the need for the force, the court reasoned that using the taser was more reasonable than the alternative. *Id.* If the officer had not used the taser on the plaintiff, he would have had to physically handcuff the plaintiff, which would likely have "escalated a tense and difficult situation into a serious physical struggle" that could have resulted in injury to the officer and the driver. *Id.* Further, the court reasoned that the amount of force exerted by a single use of a taser was proportionate to the need for force, considering the driver refused to get the documents five times, "used profanity, moved around and paced in agitation, and repeatedly yelled." *Id.* Finally, the court observed that the single use of the taser did not seriously injure the driver, as evidenced by the driver "standing up, handcuffed, and coherent shortly after the taser gun stunned and calmed him." *Id.* The court reasoned that the lack of serious

injuries suffered by the truck driver further supported the court's conclusion that the officer did not use excessive force. *Id.*

At the opposite end of the spectrum from *Draper*, the single use of a taser "against a non-hostile and non-violent suspect who has not disobeyed instructions" is excessive force. *Fils*, 647 F.3d at 1289. The plaintiff in *Fils* was standing in a "calm" crowd outside a night club. *Id.* at 1288. The crowd had formed around police officers who were arresting the plaintiff's friend. While talking to a club promoter with his back turned towards the arresting officers, the plaintiff referred to the arresting officers, saying "they're overreacting, these motherf****** are overreacting." *Id.* One of the officers overheard this comment, walked up behind the plaintiff's back, said "what you said, motherf*****?", and pulled out his taser. *Id.* The plaintiff turned around, put his hands up, and took a step backwards. The police officer said nothing and shot the taser into the plaintiff's chest. The Eleventh Circuit held that this single use of a taser was excessive force under the circumstances. *Id.* at 1290. The court reasoned that the plaintiff was not arrested for a serious crime, was not a threat to the officer or anyone else, and was not "resisting or attempting to escape." *Id.* at 1288–89. Further, the court noted that the plaintiff "did not ignore any verbal instructions" from the police officer, was "merely having a private

conversation" before the tasing officer approached him, and when the plaintiff saw the taser, he put his hands in the air and stepped away from the officer. *Id.* at 1289.

In light of this binding authority, the Court concludes that Deputy Ward's single use of the taser on the Plaintiff was "reasonably proportionate" to the need for force in the "difficult, tense and uncertain situation" that he and the other officers faced. *See Draper*, 369 F.3d at 1278. Viewing the facts in the light most favorable to the Plaintiff, the situation Deputy Ward faced was more dangerous than what the officer in *Draper* faced. Deputy Ward testified that he saw Plaintiff fidgeting inside the fleeing car as if she were reaching for a weapon.[10] And because Ricky had just exited the car with a gun in his hands, Deputy Ward knew that at least one person was armed. Further, while Deputy Ward does not state what weapon he reasonably believed Plaintiff could have possessed at the time, Plaintiff admits to being within eight to twelve feet of him and Officer Deason. This proximity is dangerously close no matter the weapon. Lastly, the entire interaction between Deputy Ward and Plaintiff occurred mere seconds after the officers shot Ricky, and Officers Deason and Gray were still securing Ricky when Deputy Ward fired his taser. Those facts together lead to the conclusion that, when Plaintiff walked away from the other

---

[10] Plaintiff does not dispute that she was fidgeting inside the car.

officer[11] and approached Deputy Ward wearing baggy clothing and screaming curse words, Deputy Ward reasonably believed that she was an immediate threat to him and the other officers on the scene. If the officer in *Draper* used proportionate force when he tased a truck driver that was not suspected of having any weapons, then Deputy Ward's single use of the taser on a person he reasonably believed could have been armed was "reasonably proportionate to the need for force." And this situation starkly contrasts to the "calm" situation seen in *Fils*.

The fact that the Plaintiff did not *actually* have a weapon when Deputy Ward tased her does not indicate that a reasonable officer under the circumstances would not have perceived her to be a threat. Plaintiff was wearing baggy clothing that could conceal a weapon and standing dangerously close to Deputy Ward and the other officers. Also, Deputy Ward had seen Plaintiff fidgeting inside the fleeing car as if she were reaching for a weapon. These facts show that a reasonable officer under the circumstances could have perceived the Plaintiff to be a threat of serious injury to Deputy Ward and his fellow officers. And so, a reasonable officer under the circumstances would not have allowed Plaintiff an opportunity to inflict harm. *See*

---

[11] Deputy Ward claims that Plaintiff "broke away" from Officer Deason while Plaintiff merely states that she "walk[ed] to the rear of the vehicle" after "an officer assist[ed] [her] in getting out of the passenger side of the vehicle." Because this Court views the facts in the light most favorable to Plaintiff at this stage and the video is not sufficiently clear to settle this factual debate, this Court has interpreted Plaintiff to have walked away from the car without interacting with Officer Deason.

*Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007) ("[T]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect."). Because it was reasonable at the time for Deputy Ward to believe that Plaintiff posed a threat, considering the fact that Plaintiff was not actually armed in order to determine the level of threat she posed to a reasonable officer under the circumstances would require employing "the 20/20 vision of hindsight" and ignoring the necessary "split-second judgment" Deputy Ward was forced to make, which is exactly what courts are told not to do. *See Graham*, 490 U.S. at 396–97.

The minor injuries that Plaintiff suffered from being tased further support the Court's conclusion that Deputy Ward did not use excessive force. Like in *Draper*, Deputy Ward's decision to use his taser resulted in no serious injury, only bruises and some pain. Further, the video shows that Plaintiff was standing on her own, handcuffed, and coherent shortly after being tased, like the truck driver in *Draper*. In fact, just a few minutes after being tased, Plaintiff walked to Deputy Ward's police car without assistance and was coherent enough to ask him for her cigarettes.

Plaintiff's attempts to differentiate this case from *Draper* fail to show that Deputy Ward used excessive force. Plaintiff argues the video shows that she was not "hostile, belligerent, and uncooperative" because she raised her hands and made no

agitated motions or gestures. However, even assuming that she had made no agitated motions or gestures, Plaintiff's comparison fails to account for the fact that Deputy Ward reasonably believed that the Plaintiff could have been armed, that she was wearing baggy clothing that could have concealed a weapon, and that she was screaming curse words. Further, while Plaintiff notes that she stopped talking and raised her hands after Deputy Ward told her to get down the first time, she fails to note that she nonetheless disregarded Deputy Ward's three orders to get on the ground. The sum of this accounting, even after crediting Plaintiff's hand raising and deducting her lack of agitated motions, amounts to the conclusion that Plaintiff was at least as "hostile, belligerent, and uncooperative" as the plaintiff in *Draper* and was far from as "calm" as the plaintiff in *Fils*.

Likewise, Plaintiff's attempts to differentiate the facts of this case from *Moore v. Gwinnett Cty.*, 805 F. App'x 802, 805 (11th Cir. 2020) (finding that police officer's use of taser to arrest a woman in a dark foyer was not excessive force) fail to demonstrate that Deputy Ward's use of the taser was excessive. Plaintiff's argument that "there was no element of potential danger" in the situation Deputy Ward faced simply because it occurred in full daylight requires ignoring all facts of this case besides the time of day. As discussed above, a reasonable officer could have perceived himself to be in a dangerous situation under the circumstances Deputy

Ward faced. Relying upon the absence of darkness to prove the safety of the situation in this case would be as unreasonable as relying upon the absence of a car chase in the dark foyer to prove the safety of the situation in *Moore*. Certainly the level of lighting can affect the safety of a situation. But the totality of the circumstances in this case shows that a reasonable officer could have found the situation Deputy Ward faced to be dangerous.

Courts are not called to evaluate the conduct of police officers from the perspective of "the peace of a judge's chambers," *Graham*, 490 U.S. at 396 (quoting *Johnson v. Glick*, 481 F.2d, 1028, 1033 (2nd Cir. 1973)), nor may they employ "the 20/20 vision of hindsight" to evaluate the decisions police officers make, *Jones v. Fransen*, 857 F.3d 843, 852 (11th Cir. 2017) (citation omitted). Rather, courts must "make special allowance[s]" for police officers as they act "in 'tense, uncertain, and rapidly evolving' situations." *Shaw v. City of Selma*, 884 F.3d 1093, 1100 (11th Cir. 2018) (quoting *Penley v. Eslinger*, 605 F.3d 843, 850 (11th Cir. 2010)). But even with the benefit of hindsight and without giving him any special allowances, an examination of the totality of the circumstances surrounding this case shows that the actions of Deputy Ward were objectively reasonably. Accordingly, Plaintiff has failed to provide sufficient evidence to allow a reasonable jury to conclude that Deputy

Ward's use of the taser violated Plaintiff's Fourth Amendment protection from excessive force.

### 2. Even if Deputy Ward's single use of the taser was excessive force, it was not clear to a reasonable officer under the circumstances that such conduct would violate the Fourth Amendment.[12]

Along with proving that there was a constitutional violation, plaintiffs must also prove that the violation was "clearly established" at the time of the alleged violation to overcome qualified immunity. "For the law to be 'clearly established,' case law must ordinarily have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir. 2000). "[T]he facts of the case before the court must be materially similar to the facts in the precedent that clearly establishes the deprivation." *Merricks v. Adkisson*, 785 F.3d 553, 559 (11th Cir. 2015). While plaintiffs are not required to cite to cases with facts that are identical to their own case, "an existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011). In other words, "[a] Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently

---

[12] The Court notes that Plaintiff failed to argue that the law was "clearly established" at the time of the alleged violation.

clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). This second part of the qualified immunity doctrine, together with the first prong previously discussed, is designed to give government officials fair warning of what conduct constitutes a legal violation: "The salient question is whether the state of the law at the time of an incident provided 'fair warning' to the defendants that their alleged conduct was unconstitutional." *Salvato v. Miley*, 790 F.3d 1286, 1292 (11th Cir. 2015) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014)). With these principles as its guide, the doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments," *Ashcroft*, 563 U.S. at 743, but allows government officials to be held accountable when they violate clearly established law.

When approaching the "clearly established" prong of qualified immunity, this Court considers case law from the United States Supreme Court, the Eleventh Circuit Court of Appeals, and the Alabama Supreme Court. *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011). Plaintiff fails to cite a single binding case where the court found that an officer's single use of a taser under factually similar circumstances constituted excessive force. The most factually similar case the Court found in its independent research was *Fils*. But the plaintiff in *Fils* was "a non-hostile

and non-violent suspect who [had] not [then] disobeyed instructions," while Plaintiff in this case was "hostile, belligerent, and uncooperative." Thus, even if this Court had concluded that Deputy Ward's use of force was excessive, *Fils* did not "clearly establish" that Deputy Ward's conduct violated the Fourth Amendment.

The Court additionally notes that this case does not fall into the narrow "obvious clarity" exception for qualified immunity cases. "[I]n the absence of fact-specific case law," plaintiffs may overcome qualified immunity "when [a] preexisting general constitutional rule applies 'with *obvious clarity* to the specific conduct in question,' and it must have been '*obvious*' to a reasonable police officer that the pertinent conduct given the circumstances must have been unconstitutional at the time." *Vinyard v. Wilson*, 311 F.3d 1340, 1352 (11th Cir. 2002) (emphases added) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). Cases where this "obvious clarity" rule[13] applied to Fourth Amendment excessive force claims typically involve conduct "far beyond the hazy border between excessive and acceptable force." *Id.* at 1350 n.18. Fourth Amendment excessive force claims that satisfy the "obvious

---

[13] One reason for this exception is that these cases often involve issues that are so clear that they are not litigated. *See United States v. Lanier*, 520 U.S. 259, 271 (1997) ("The easiest cases don't even arise.") (citation omitted)). Another reason for this exception is that "[i]t would create perverse incentives indeed if a qualified immunity defense could succeed against those types of claims that have not previously arisen because the behavior alleged is so egregious that no like case is on the books." *McDonald v. Haskins*, 966 F.2d 292, 295 (7th Cir. 1992). Neither of these underlying reasons for the exception support finding that this case meets the "obvious clarity" exception.

clarity" exception are typically characterized by egregious and despicable conduct that lacks any sort of reasonable justification. *See, e.g.*, *Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1307 (11th Cir. 2006) (finding that constitutional rule applied with "obvious clarity" when officer handcuffed a compliant, non-threatening nine-year-old girl solely to punish her); *Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000) (finding that constitutional rule applied with "obvious clarity" when officer badly beat a suspect "even though he was handcuffed and did not resist, attempt to flee, or struggle with the officers in any way"); *Priester*, 208 F.3d at 928 (finding that constitutional rule applied with "obvious clarity" when police officer ordered police dog to attack an innocent, complying bystander, and officer watched the dog bite him though "[p]laintiff was begging that the dog be called off").

Deputy Ward's conduct in this case is at worst within "the hazy border between excessive and acceptable force" and is clearly unlike the egregiousness and despicableness of the conduct seen in "obvious clarity" excessive force cases. As a result, it cannot be said that a consideration of the relevant standard applied to Deputy Ward's conduct would "inevitably lead every reasonable officer in [the defendant's] position to conclude the force was unlawful." *Priester*, 208 F.3d at 926. Thus, this case does not fall into the narrow "obvious clarity" exception for the "clearly established" prong of the qualified immunity analysis.

Accordingly, even if Deputy Ward did use excessive force, such a violation was neither "clearly established" according to fact-specific case law, nor was it "readily apparent" that such conduct was unlawful. Accordingly, Deputy Ward is entitled to qualified immunity.

**C. The failure to train claim against Sheriff Wade fails as a matter of law.**

Sheriff Wade argues that he is entitled to summary judgment because there is no underlying constitutional violation upon which his liability could be based. The Court agrees. Because Plaintiff has failed to establish that Deputy Ward violated her constitutional rights, her claim that Sheriff Wade violated her constitutional rights on the basis of failure to train necessarily fails as well. *See Hicks v. Moore*, 422 F.3d 1246, 1253 (11th Cir. 2005) ("Because we conclude that Plaintiff's constitutional rights were not violated by the search, Plaintiff cannot maintain a § 1983 action . . . against . . . Sergeant Gosnell for failure to train.").

**IV.    Conclusion**

Because Deputy Ward's single use of his taser on the Plaintiff was objectively reasonable, he did not use excessive force. But even if his single use of the taser on Plaintiff was excessive force, it would not have been a violation of "clearly established" law. By either line of reasoning, Deputy Ward is entitled to qualified immunity. Additionally, because Plaintiff has failed to establish that Deputy Ward

violated her constitutional rights, her claim that Sheriff Wade violated her constitutional rights on the basis of failure to train necessarily fails. Accordingly, the Defendants' motions for summary judgment are due to be GRANTED, and this action is due to be DISMISSED WITH PREJUDICE. An order consistent with this Opinion will be entered contemporaneously herewith.

**DONE** and **ORDERED** on July 9, 2020.

L. Scott Coogler
United States District Judge

199335